T.C. Memo. 2005-233

UNITED STATES TAX COURT

KARNS PRIME & FANCY FOOD, LTD., Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 906-04.                    Filed October 5, 2005.

<u>John D. Sheridan</u> and <u>Steven J. Schiffman</u>, for petitioner.

<u>Gerald A. Thorpe</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

CHIECHI, <u>Judge</u>:  Respondent determined a deficiency of $486,355 in petitioner's Federal income tax (tax) for the taxable year ended January 30, 2000 (year at issue).

The only issue for decision is whether the $1.5 million ($1.5 million at issue) that petitioner received from its principal supplier during the year at issue constitutes a loan that is

not includable in its gross income.  We hold that it does not.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

At the time of the filing of the petition in this case, petitioner's principal place of business was in Mechanicsburg, Pennsylvania.

During the year at issue, petitioner, a corporation organized under the laws of Pennsylvania, operated several grocery stores in towns located around Harrisburg, Pennsylvania.  During that year, Super Rite Foods, Inc. (Super Rite), one of petitioner's suppliers of grocery items since the 1970s, was petitioner's principal supplier.

In 1998, Scott Karns (Mr. Karns), who at all relevant times was petitioner's chief executive officer, concluded that petitioner needed $1.5 million for capital improvements.  In that year, Mr. Karns approached Dale Conklin (Mr. Conklin), who was then president of Super Rite, to discuss obtaining financial assistance from Super Rite for petitioner's capital needs.

At certain times during the relevant time period, certain of Super Rite's customers approached it seeking some form of financial assistance (e.g., an advance of funds, a lease guaranty, a supply agreement commitment).  Although Super Rite preferred that its customers obtain financial assistance from outside sources, from time to time (around 10 to 15 times a year) it decided to

provide some form of financial assistance to certain of its creditworthy and strategically important customers in order to help them meet their respective financial needs.  The amount of funds that Super Rite was willing to advance to a customer depended upon Super Rite's estimate of its potential profit under the supply agreement that it required of such customer.

Before Super Rite agreed to provide financial assistance to a customer, it required each such customer to (1) enter into a written supply agreement (supply agreement) that, inter alia, required the customer to purchase annually a minimum amount of products and that contemplated that Super Rite would pay an advance price rebate to such customer at the inception of such supply agreement and (2) execute a promissory note (note) payable to Super Rite in the amount of any such advance rebate.  Although Super Rite expected that the customer would satisfy the minimum annual purchase requirement set forth in the supply agreement, Super Rite nonetheless required the customer to execute a note payable to it in order to facilitate repayment of all or a portion of such advanced funds in the event that the customer did not satisfy such minimum annual purchase requirement or otherwise materially breached the supply agreement.[1]  Super Rite intended

---

[1]Even in a situation where a customer of Super Rite did not seek an advance of funds from Super Rite, Super Rite may have agreed to enter into a supply agreement with such customer that, inter alia, required the customer to purchase annually a minimum

(continued...)

that the customer's obligation to repay funds that it advanced would arise only if the customer materially breached the supply agreement.

While petitioner was negotiating with Super Rite with respect to the terms of the supply agreement and the corresponding note that Super Rite required as conditions to Super Rite's advancing any funds to it, petitioner requested, and received, permission from PNC Bank, petitioner's primary bank, to enter into such supply agreement and to execute such note. That is because petitioner had outstanding indebtedness to PNC Bank, and the loan documents with respect to that indebtedness required PNC Bank's permission before petitioner entered into any transaction in which it received an advance of funds that it might have to repay and/or with respect to which certain of petitioner's assets were to serve as collateral. In all events, PNC Bank was to retain a first security interest in any assets of petitioner that served as collateral with respect to petitioner's outstanding

---

[1](...continued)
amount of products and that contemplated that Super Rite would pay an advance price rebate to such customer at the inception of such supply agreement. Before Super Rite entered into such a supply agreement, it required the customer to execute a note payable to Super Rite in the amount of any such advance rebate in order to facilitate repayment of such advanced funds in the event that the customer did not satisfy the minimum annual purchase requirement set forth in the supply agreement or otherwise materially breached that agreement.

indebtedness to that bank.[2]

As a result of negotiations between Mr. Conklin and Mr. Karns, Super Rite agreed to advance $1.5 million to petitioner and petitioner agreed to execute the supply agreement and the corresponding note required by Super Rite.[3] In agreeing to the $1.5 million advance to petitioner and to the terms of the supply agreement and the corresponding note that Super Rite required of petitioner, Super Rite had concluded, inter alia, that petitioner would be entitled to an estimated $1.5 million rebate under such supply agreement if petitioner did not materially breach that agreement.[4]

On April 16, 1999, petitioner executed the supply agreement (April 16, 1999 supply agreement) that Super Rite required of petitioner as a condition to Super Rite's advancing $1.5 million to it. Petitioner also executed the corresponding $1.5 million

---

[2]The supply agreement between petitioner and Super Rite (discussed below) provided that PNC Bank was to have a first security interest in certain equipment that was described in that agreement as collateral with respect to petitioner's obligations under the supply agreement.

[3]Prior to agreeing to enter into a supply agreement with Super Rite, petitioner did not have a supply agreement with that supplier.

[4]Prior to agreeing to enter into a supply agreement with Super Rite, petitioner did not receive any price rebates from Super Rite with respect to its purchase of products from that supplier.

note (April 15, 1999 note)[5] dated April 15, 1999, and payable to Super Rite that Super Rite also required of petitioner as a condition to Super Rite's advancing $1.5 million to it.

Pursuant to the April 16, 1999 supply agreement, petitioner agreed to purchase annually from Super Rite $16 million in products over a six-year period. The April 16, 1999 supply agreement provided in pertinent part:

> 1. <u>Supply of Requirements; Certification</u>. Throughout the term of this Agreement, Super Rite will be the principal wholesaler for all products purchased by the Retailer [petitioner] for sale in the Retailer's stores that are located within the geographic area served by Super Rite. Throughout the term of this Agreement, the Retailer shall purchase at least $16,000,000.00 of product from Super Rite each year of this Agreement. * * *
>
> 2. <u>Pricing and Payment Terms</u>. During the term of this Agreement, product pricing, fees, billing and payment terms, returns and credits for products purchased, and other terms and conditions governing the sale of products hereunder shall be governed by Super Rite's general policies and practices in effect from time to time. In addition, Retailer shall receive a private label incentive to be determined on the basis of Exhibit A attached hereto and further, Retailer fees for Grocery, Frozen and Dairy shall be in accordance with Exhibit B attached hereto.[6] The parties further agree that Retailer's payment terms shall be seven (7) days. Failure by the Retailer to make payment to Super Rite of amounts due for the delivery of goods hereunder

---

[5]By using the term "April 15, 1999 note", we do not intend to suggest that for tax purposes there was a loan by Super Rite to petitioner that was evidenced by that document.

[6]Prior to the April 16, 1999 supply agreement, Super Rite (1) did not provide petitioner with any incentives for private label purchases and (2) charged petitioner fees higher than those set forth in exhibit B attached to that supply agreement.

in accordance with the payment terms governing any shipment of goods shall constitute a default hereunder and, in addition to its rights under Section 5 of this Agreement, Super Rite may suspend shipments to the Retailer for so long as such default remains uncured.

3.    Term.    This Agreement shall remain in full force and effect until April 16, 2005.    Thereafter, this Agreement shall automatically be renewed for successive periods of one (1) year each unless either party gives written notice to the other party at least sixty (60) days prior to the expiration of the initial term or any renewal term hereof that it desires to terminate this Agreement at the end of such term.

4.    Delays in Supply.    Neither party hereto shall be liable for any default or delay in the performance of its obligations hereunder caused by any contingency beyond its control * * *.    In the event of a Delay that materially impairs Super Rite's shipments to the Retailer or the Retailer's purchases from Super Rite, the other party's obligations hereunder shall be reduced for the period including the Delay in proportion to the impairment and, in the case of a Delay affecting Super Rite, the Retailer shall be expressly permitted to cover such reductions by purchases from other wholesalers (it being expressly understood that Super Rite shall incur no liability to the Retailer for any increased costs or expenses related thereto). * * *

5.    Cancellation by Super Rite.    Super Rite may cancel this Agreement:  (i) upon the failure by the Retailer to make payment to Super Rite in accordance with Section 2 hereof for goods delivered hereunder; (ii) immediately upon the filing of a petition for relief by the Retailer in a voluntary proceeding under applicable federal or state bankruptcy law or like laws for the protection of debtors or upon the application of the Retailer to any court or administrative agency of competent jurisdiction for the appointment of a receiver or trustee for the administration of the Retailer's affairs; (iii) upon the filing of a petition for relief with respect to the Retailer in an involuntary proceeding under applicable federal or state bankruptcy law or like laws for the protection of debtors or upon the application by a third party to any court or administrative agency of competent jurisdiction for the appointment of a receiver or trustee for

the administration of the affairs of the Retailer, if an order for relief shall be entered and continued unstayed in effect for thirty (30) days or such petition or application shall continue undismissed for sixty (60) days; (iv) following the breach of any obligation of the Retailer hereunder, if such breach is not cured within thirty (30) days following notice thereof to the breaching party; (v) following the default by Retailer in the performance of or compliance with any material contract, instrument or agreement, including, without limitation, any lease of real property, any material lease of personal property or any promissory note, instrument or agreement evidencing or in respect of any indebtedness for borrowed money or any security therefor, if such default is not cured within any applicable period of grace, or (vi) immediately upon the occurrence of a material adverse change in the condition (financial or otherwise), business or prospects of the Retailer or any guarantor of the Retailer's liabilities and obligations hereunder. * * *

6. <u>Cancellation by the Retailer</u>. The Retailer may cancel this Agreement: (i) immediately upon the filing of a petition for relief by Super Rite in a voluntary proceeding under applicable federal or state bankruptcy law or like laws for the protection of debtors or upon the application of Super Rite to any court or administrative agency of competent jurisdiction for the appointment of a receiver or trustee for the administration of Super Rite's affairs; (ii) upon the filing of a petition for relief with respect to Super Rite in an involuntary proceeding under applicable federal or state bankruptcy law or like laws for the protection of debtors or upon the application by a third party or [sic] any court or administrative agency of competent jurisdiction for the appointment of a receiver or trustee for the administration of the affairs of Super Rite, if an order for relief shall be entered and continued unstayed in effect for thirty (30) days or such petition or application shall continue undismissed for sixty (60) days; or (iii) following the breach of any obligation of Super Rite hereunder, if such breach is not cured within thirty (30) days following notice thereof to Super Rite. * * *

7. <u>Liquidated Damages</u>.  The parties understand that Super Rite's commitment to supply the specified requirements of the Retailer will require an allocation of resources by Super Rite that would not be practical if the Retailer were to purchase less than such specified percentage requirements from Super Rite.  The parties agree that the Retailer's failure to perform its obligations hereunder will cause damage to Super Rite that will be difficult or impossible to prove accurately and, therefore, with the intention of providing a fair and reasonable formula to calculate the amount of such damage, the parties agree that upon Super Rite's cancellation of this Agreement pursuant to Sections 2 or 5 of this Agreement, the Retailer will pay Super Rite as liquidated damages an amount equal to 1.0% of the product of (i) the Retailer's aggregate purchases from Super Rite during the preceding calendar year multiplied by (ii) the number of years remaining in the term of this Agreement.  The amount of the Retailer's aggregate purchases and Super Rite's damages for periods of less than one year shall be calculated on a pro rata basis.

8. <u>Pledge on Assets</u>.  As collateral security for the prompt and complete payment and performance when due of all of Retailer's liabilities and obligations to Super Rite hereunder, Retailer hereby mortgages, pledges, hypothecates and grants to Super Rite a lien and security interest in all right, title and interest which Retailer may now or hereafter have in, to and under the following, wherever located (collectively, the "Collateral"):  (i) all "Inventory", as such term is defined in Section 9-106(4) of the Uniform Commercial Code * * * (the "Code") * * *; (ii) all "Accounts" as such term is defined in Section 9-106 of the Code * * *; (iii) all "Equipment" as such term is defined in Section 9-109(2) of the Code * * *; and (iv) all "Proceeds" of the foregoing, as such term is defined in Section 9-306(1) the Code [sic] * * *.  Retailer covenants that during the term of this Agreement it will not, without Super Rite's prior written consent, create, incur, assume, or suffer to come into existence any mortgage, pledge, lien or other encumbrance upon any of the Collateral or the Proceeds thereof, wherever located, now existing or hereafter acquired, other than that granted to Super Rite hereunder.  Retailer agrees to execute and deliver such documents, and to take such action, as Super Rite may request to perfect and con-

tinue Super Rite's lien on and security interest in such Collateral.  Provided, however, Super Rite acknowledges that PNC Bank has first place security interest on Retailer's equipment located at its' [sic] West Shore Plaza Store.

8.1.  Financial Statements.  Retailer shall furnish to Super Rite, no later than ninety (90) days after the end of each fiscal quarter of Retailer, the internal statements of Retailer and every six months the reviewed balance sheet of Retailer, together with its statement of income, retained earnings and cash flow for the fiscal quarter.  Each year, upon Retailer's request, Super Rite shall provide Retailer with a letter confirming the forgiveness of debt in accordance with that Promissory Note, of even date herewith,[7] by and between Super Rite and Retailer.

9.  Coupon Redemption Service.  During the term of this Agreement, Retailer agrees to use Super Rite's coupon service for the redemption of all coupons received by Retailer [and] to pay for such service at the rates established by Super Rite from time to time.[8]

The April 15, 1999 note provided in pertinent part:

FOR VALUE RECEIVED, KARNS PRIME & FANCY FOODS, LTD., * * * (the "Borrower"), hereby promises to pay to the order of SUPER RITE FOODS, INC., * * * (the "Lender"), * * * the principal sum of ONE MILLION FIVE HUNDRED THOUSAND NO/100 DOLLARS ($1,500,000.00).  The Borrower hereby further promises to pay interest on the unpaid principal balance hereof at a rate per annum equal to the Prime Rate (as hereinafter defined) plus 1% * * *.  Interest shall accrue daily from the date

---

[7]The April 16, 1999 supply agreement referred to the April 15, 1999 note as a note of "even date".  The record does not clarify the inconsistency between the date of that note to which the supply agreement referred (i.e., Apr. 16, 1999) and the date of that note to which such note referred (i.e., Apr. 15, 1999). What is clear from the record is that the April 16, 1999 supply agreement and the April 15, 1999 note were entered into around the same time and were interdependent.  See infra note 9.

[8]Prior to the April 16, 1999 supply agreement, petitioner was not entitled to Super Rite's coupon redemption service.

hereof on the unpaid principal balance hereof and shall be computed on the basis of the actual number of days for which due.

The principal balance of this Note shall be repaid in six (6) annual payments of $250,000.00 each, commencing on April 16, 2000, and continuing on the third Friday of each April thereafter through and including April 16, 2005; provided however, that the payment of the annual payment shall be forgiven by the Lender [Super Rite] if the Lender determines that the Borrower is in compliance with, and shall not have materially breached or then be in uncured default under, that certain Supply and Requirements Agreement of even date herewith[9] among the Borrower and Lender. The entire unpaid and unforgiven principal balance hereof shall be due and payable, if prior to April 16, 2005, Borrower ceases, for any reason, to use Lender as its primary food supplier. Notwithstanding the foregoing, the entire unpaid and unforgiven principal balance hereof and accrued interest thereon shall be due and payable on April 16, 2005.

Even though execution of the April 16, 1999 supply agreement and the corresponding April 15, 1999 note occurred in mid-April 1999, it was not until around May 4, 1999, that petitioner received the $1.5 million at issue.[10] Around that last date, Rich Foods, Inc. (Rich Foods), the then parent of Super Rite,

---

[9]The April 15, 1999 note referred to the April 16, 1999 supply agreement as a supply agreement of "even date". The record does not clarify the inconsistency between the date of that supply agreement to which the note referred (i.e., Apr. 15, 1999) and the date of that supply agreement to which such supply agreement referred (i.e., Apr. 16, 1999). What is clear from the record is that the April 15, 1999 note and the April 16, 1999 supply agreement were entered into around the same time and were interdependent. See supra note 7.

[10]The record does not explain why petitioner did not receive until May 4, 1999, the $1.5 million to which the April 16, 1999 supply agreement and the corresponding April 15, 1999 note pertained.

gave petitioner a $1.5 million check drawn on Rich Foods' checking account.

During the year at issue in August 1999, SUPERVALU, Inc. (SUPERVALU), acquired Rich Foods. SUPERVALU recorded the $1.5 million advanced to petitioner in SUPERVALU's fixed asset ledger as a supply rebate that was to be amortized over six years in monthly installments of $19,230.77. Petitioner recorded the April 15, 1999 note in its books and records as a long-term note payable.

Petitioner expended $750,000 of the $1.5 million at issue on capital improvements and temporarily invested the balance in certificates of deposit (CDs). Petitioner pledged the CDs as collateral for a $960,000 loan from PNC Bank. Petitioner used the $960,000 in PNC Bank loan proceeds for capital improvements.

During the latter part of the year at issue, Mr. Karns concluded that it would be desirable to relocate one of petitioner's stores. As a result, he entered into negotiations to lease a new site for that store. The prospective lessor of that site refused to lease it to petitioner without a guaranty of petitioner's lease obligations.

At all relevant times, SUPERVALU agreed to act from time to time as a guarantor of a customer's lease obligations where SUPERVALU concluded that to do so would serve SUPERVALU's business interests. Around January 25, 2000, SUPERVALU guaranteed

petitioner's obligations under the lease (petitioner's lease) of the new site for one of petitioner's stores.  In return for SUPERVALU's guaranty of petitioner's lease, on January 26, 2000, petitioner entered into several agreements with SUPERVALU, including:  (1) An agreement that granted to SUPERVALU a security interest in certain of petitioner's assets;[11] (2) a first amendment to the April 16, 1999 supply agreement that, inter alia, amended the term of that supply agreement[12] but that did not alter petitioner's annual purchase requirement under the April 16, 1999 supply agreement; (3) a retailer's agreement that (a) required SUPERVALU to make its product lines available to petitioner at certain prices and to provide petitioner with certain services, including field advisory, warehousing, and marketing services, and (b) required petitioner to comply with SUPERVALU's payment, accounting, inventory, and confidentiality

_____

[11]Around early February 2000, SUPERVALU filed financing statements with Cumberland County, Pa., and the Pennsylvania secretary of state in order to perfect the security interest in certain of petitioner's assets that petitioner granted to SUPERVALU on Jan. 26, 2000.

[12]The first amendment to the April 16, 1999 supply agreement provided in pertinent part:

> The term of the [April 16, 1999 supply] Agreement is hereby amended such that Retailer's [petitioner's] obligations under this Agreement shall continue in effect for the longer of (a) five (5) years from the Execution Date, or (b) as long as any Capital Commitment [i.e., any capital committed by SUPERVALU for the benefit of petitioner] remains outstanding.

requirements; (4) a mediation/arbitration agreement that required petitioner and SUPERVALU to resolve any controversy, claim, or dispute by mediation or arbitration; and (5) a reimbursement agreement that required petitioner to pay annually to SUPERVALU 10 percent of the petitioner's lease value. In addition, as was customary for SUPERVALU when it guaranteed one of its customer's lease obligations, SUPERVALU required petitioner to enter into an option agreement with SUPERVALU that gave SUPERVALU the right to take over petitioner's lease in the event that petitioner defaulted under it.[13]

On January 26, 2000, petitioner's officers, who were also stockholders of petitioner, executed an agreement in which they guaranteed various obligations that petitioner had to SUPERVALU and/or its subsidiaries. Such obligations included petitioner's obligations under the April 16, 1999 supply agreement and the corresponding April 15, 1999 note.

Petitioner satisfied the annual purchase requirement set forth in the April 16, 1999 supply agreement for each of the periods ended April 16, 2000, and April 16, 2001, and otherwise complied with, did not materially breach, and was not in uncured

---

[13]It has been SUPERVALU's practice to take over customer leases that it guaranteed where its customers were in default under them.

default under that supply agreement.[14]  As a result, petitioner was not obligated to make on each of those dates the annual payment set forth in the April 15, 1999 note.  In petitioner's books and records for each of the years ended January 30, 2001, and January 30, 2002, petitioner reduced by $250,000 the balance of its long-term notes payable.  In each of petitioner's tax returns for those respective years, petitioner reported $250,000 as "Other Income--Reduction of Supplier Note Agreement".

On March 9, 2001, petitioner executed a document entitled "COMMERCIAL NOTE" (March 9, 2001 commercial note)[15] payable to SUPERVALU in the amount of $300,000.  On or about the same date, petitioner received a $300,000 check drawn on an account of SUPERVALU.  The March 9, 2001 commercial note provided in pertinent part:

> FOR VALUE RECEIVED, Karns Prime and Fancy Food Ltd. * * * (collectively the "Maker"), promise[s] to pay to SUPERVALU * * * ("Lender") * * * the principal sum of Three Hundred Thousand and No/100 Dollars ($300,000.00), plus interest, all as set forth below.

---

[14]Instead of discussing whether petitioner complied with, materially breached, and/or was in uncured default under the April 16, 1999 supply agreement, for convenience, we shall discuss only whether petitioner was in material breach of or materially breached that supply agreement.  However, our references to whether petitioner was in material breach of or materially breached the April 16, 1999 supply agreement are intended also to pertain to whether petitioner complied with and/or was in uncured default under that supply agreement.

[15]By using the term "March 9, 2001 commercial note", we do not intend to suggest that for tax purposes there was a loan by SUPERVALU to petitioner that was evidenced by that document.

Interest upon all principal advanced under this Note shall accrue, from the date of its advance and until repaid, at a rate of ten and seven tenths percent (10.70%) per annum. * * *

Principal and interest due Lender under this Note shall be payable as follows:

(a)  A payment of Ninety One Thousand Five Hundred Two and 83/100 Dollars ($91,502.83), including principal and accrued and unpaid interest, shall be due and payable on March 9 2002; a payment of Ninety One Thousand Five Hundred Two and 83/100 Dollars($91,502.83), including principal and accrued and unpaid interest, shall be due and payable on March 9 2003; a payment of Ninety One Thousand Five Hundred Two and 83/100 Dollars($91,502.83), including principal and accrued and unpaid interest, shall be due and payable on March 9 2004, a payment of Ninety One Thousand Five Hundred Two and 83/100 Dollars($91,502.83), including principal and accrued and unpaid interest, shall be due and payable on March 9 2005; and

(b)  The entire remaining principal balance, plus all accrued and unpaid interest, shall be due and payable in full on June 9, 2005.

    *       *       *       *       *       *       *

This Note shall be IN DEFAULT and, at Lender's option, the total unpaid principal under this Note, all accrued interest thereon and all other amounts owed by any Maker to Lender, whether evidenced by this Note or otherwise, shall be immediately due and payable, without notice, protest, or demand, upon the occurrence of any one or more of the following events of default: (a) the failure of any Maker to pay any amount when due or to perform any other obligation as required under this Note; (b) the occurrence of any default by any Maker or any future guarantor (there presently being no guarantors) of this Note (called a "Guarantor" below) under any other obligation to or agreement with Lender or any SUPERVALU Entity (as defined below), including any default by any Maker or any Guarantor under any supply agreement in favor of any SUPERVALU Entity and any failure by any Maker or any Guarantor to pay any

open account obligation to any SUPERVALU Entity; * * *

If this Note, any payment required to be made under this Note or any other obligation payable to Lender or any SUPERVALU Entity is not paid on the due date (whether at original maturity or following acceleration), in addition to any other rights Lender may have under this Note, any related agreement or under applicable law, Lender shall have the right to set off the indebtedness evidenced by this Note against any indebtedness of Lender or any SUPERVALU Entity to any Maker or Guarantor. [Reproduced literally.]

On March 9, 2001, petitioner and SUPERVALU also entered into a second amendment to the April 16, 1999 supply agreement (March 9, 2001 supply agreement second amendment). The March 9, 2001 supply agreement second amendment provided in pertinent part:

1. **Purchase Requirement**

Effective as of the Execution Date and continuing throughout the term of the [April 16, 1999 supply] Agreement, Retailer [petitioner] shall purchase at least $21,000,000 of product from Wholesaler [Super Rite] each year of the Agreement.

2. **Sales Rebate**

As additional consideration for Retailer's entering into this Agreement, and provided no Retailer Entity is in default under this Agreement or under any Capital Commitment or other agreement with, or obligation to, any SUPERVALU Entity, Wholesaler shall rebate to Retailer a rebate (the "Rebate"), on the terms and conditions set forth below:

2.1 The purchases on which the Rebate shall be based (the "Aggregate Purchases") shall be the total purchases of Product from Wholesaler by Retailer for all of the Supermarkets in the Aggregate, up to a maximum total of Aggregate Purchases over the term of this Agreement of $89,250,000.

2.2 The Rebate shall be calculated annually,

based on the Aggregate Purchases for the twelve month period immediately preceding an anniversary of the Execution Date (the "Annual Period").

2.3 The Aggregate Purchases for the Annual Period shall be multiplied by four thousand three hundred sixty seven ten-thousandths percent (.4367%), and the product of such calculation shall be the amount of the Rebate payable by Wholesaler to Retailer for such Annual Period.

2.4 The amount of the Rebate shall be shown as a credit on the first statement sent by Wholesaler to Retailer following the end of the Annual Period.

Notwithstanding anything to the contrary which may be contained in this Section 5, at such point, if any, that the Aggregate Purchases reach $89,250,000, no further purchases shall be considered Aggregate Purchases, and no Rebate shall be due or payable with respect to any purchases which are not considered Aggregate Purchases. Wholesaler may offset against any Rebate any amounts owed to any SUPERVALU Entity by any Retailer Entity, and Wholesaler shall discontinue paying the Rebate altogether upon any default by any Retailer Entity under this Agreement, under any Capital Commitment, or under any other agreement with, or obligation to, any SUPERVALU Entity. Wholesaler shall have no obligation whatsoever to pay any Rebate in the event any Retailer Entity commences any proceeding under any bankruptcy, reorganization or similar law, or in the event a similar proceeding is filed against any Retailer Entity.

\* \* \* \* \* \* \*

4. **Agreement Continues**

Except as specifically amended herein, the Agreement continues, unmodified, in full force and effect.

For the annual period ended March 9, 2002, petitioner met

the increase in petitioner's annual purchase requirement under the March 9, 2001 supply agreement second amendment, i.e., an increase of $5 million in required annual product purchases over the $16 million in required annual product purchases set forth in the April 16, 1999 supply agreement before its amendment by the March 9, 2001 supply agreement second amendment. (We shall refer to such $5 million increase as the $5 million increase in petitioner's annual purchase requirement.) As a result, petitioner earned under the March 9, 2001 supply agreement second amendment a sales rebate for the annual period ended March 9, 2002, in an amount equal to the annual payment for that period set forth in the March 9, 2001 commercial note, and such rebate offset such annual payment. For the annual period ended March 9, 2003, petitioner did not meet the $5 million increase in petitioner's annual purchase requirement. As a result, petitioner earned under the March 9, 2001 supply agreement second amendment a sales rebate of $86,573.64 for the annual period ended March 9, 2003, which was $4,929.19 less than the annual payment for that period set forth in the March 9, 2001 commercial note. Such rebate offset $86,573.64 of such annual payment, and petitioner paid the balance of such annual payment (i.e., $4,929.19).

On June 13, 2000, petitioner, which used the accrual method of accounting, timely filed Form 1120, U.S. Corporation Income Tax Return (petitioner's return), for its taxable year ended

January 30, 2000. In that return, petitioner did not include the $1.5 million at issue in gross income.

Respondent issued a notice of deficiency (notice) to petitioner with respect to the year at issue. In the notice, respondent determined that petitioner is required to include the $1.5 million at issue in gross income for that year.

OPINION

Although respondent must have commenced respondent's examination of petitioner's return for the year at issue after July 22, 1998, the parties do not address section 7491(a).[16] In any event, we need not decide whether the burden of proof shifts to respondent under that section. That is because resolution of the issue presented here does not depend on who has the burden of proof.

The parties' sole dispute is whether the $1.5 million at issue constitutes a loan that is includable in petitioner's gross income for the year at issue.

The determination of whether a transfer of funds constitutes a loan is a question of fact. Haber v. Commissioner, 52 T.C. 255, 266 (1969), affd. per curiam 422 F.2d 198 (5th Cir. 1970). In order for a transfer of funds to constitute a loan, at the time the funds are transferred there must be an unconditional

---

[16]All section references are to the Internal Revenue Code in effect for the year at issue.

obligation (i.e., an obligation that is not subject to a condition precedent) on the part of the transferee to repay, and an unconditional intention on the part of the transferor to secure repayment of, such funds. Haag v. Commissioner, 88 T.C. 604, 616 (1987), affd. without published opinion 855 F.2d 855 (8th Cir. 1988); see also Frierdich v. Commissioner, 925 F.2d 180, 185 (7th Cir. 1991), affg. T.C. Memo. 1989-393; Clark v. Commissioner, 18 T.C. 780, 783-784 (1952), affd. per curiam 205 F.2d 353 (2d Cir. 1953). Whether a transfer of funds constitutes a loan may be inferred from objective characteristics surrounding the transfer, including the presence or absence of a debt instrument, collateral securing the purported loan, interest accruing on the purported loan, repayments of the transferred funds, and any attributes indicative of an enforceable obligation to repay the funds transferred. See, e.g., Haag v. Commissioner, supra at 615-616 & n.6. In determining whether a transfer of funds constitutes a loan, the substance, and not the form, of the transaction is controlling for tax purposes. See, e.g., Knetsch v. United States, 364 U.S. 361, 365-366 (1960).

In support of its position that the $1.5 million at issue constitutes a loan, petitioner argues:

> The advance from Super Rite on April 15, 1999 created an unconditional obligation to repay those funds. It was only a condition subsequent, i.e. fulfilling the obligations under the Supply and Requirements Agreement, on an annual basis, that gave rise to the forgiveness of the annual debt service payment.

\*        \*        \*        \*        \*        \*        \*

   In the instant case, Petitioner has demonstrated that all the indicia of a loan as well as a true creditor-debtor relationship existed.  A Promissory Note was signed \* \* \*; the Note called for interest on the unpaid balance at the rate of prime plus 1% \* \* \*; the Note was to be repaid in six annual payments of $250,000 each commencing on April 16, 2000 and continuing on the third Friday of each April thereafter through and including April 16, 2005 \* \* \* the Petitioner granted Super Rite a security interest in (i) all inventory, (ii) all accounts, (iii) all equipment, including without limitation, all machinery, equipment, furnishings and fixtures of any kind and nature and description, and (iv) all proceeds of the foregoing \* \* \*; Petitioner recorded the $1.5 million Promissory Note as a long term note payable \* \* \*; at the time of the transaction, Petitioner considered the $1.5 million as a loan \* \* \*

\*        \*        \*        \*        \*        \*        \*

   There was no guarantee in April of 1999 that the Petitioner would meet the purchase obligations or other obligations under the Supply and Requirements Agreements for the ensuing six years.  Accordingly, there was no guarantee that the future debt service payments would be forgiven.  Without any guarantee that Petitioner would be allowed to keep the funds, there is no income from the loan unless and until such time a debt service payment is forgiven.  "In determining whether a taxpayer enjoys 'complete dominion' over a given sum, the crucial point is not whether his use of the funds is unconstrained during some interim period.  The key is whether the taxpayer has some guarantee that he will be allowed to keep the money."  <u>C.I.R. v. Indianapolis Power & Light Company, 493 U.S. 203, 110 S. Ct. 589</u>.

   If Super Rite had filed for bankruptcy, the Supply and Requirements Agreement could be canceled \* \* \*.  Had Super Rite declared bankruptcy, they [petitioner] would have been under default under the Supply and Requirements Agreement and accordingly, all amounts due under the Note would have been immediately due and payable.  If the Petitioner was unable to meet their payment obligations \* \* \* under the Supply and Requirements Agreement and such default remained uncured for a period of 30 days, Super Rite could cancel the Agree-

ment * * * and as a result of such default, amounts due under the Note would immediately become due and payable.  [Reproduced literally.]

We turn first to petitioner's related arguments (1) that the $1.5 million advance by Super Rite to petitioner created an unconditional obligation on the part of petitioner to repay those funds and (2) that only a condition subsequent (i.e., compliance by petitioner with the April 16, 1999 supply agreement) gave rise to the forgiveness of the annual payment set forth in the April 15, 1999 note.  In advancing those arguments, petitioner relies on <u>Erickson Post Acquisition, Inc. v. Commissioner</u>, T.C. Memo. 2003-218, and on the following language in the April 15, 1999 note:

> The principal balance of this Note shall be repaid in six (6) annual payments of $250,000.00 each, commencing on April 16, 2000, and continuing on the third Friday of each April thereafter through and including April 16, 2005; <u>provided</u> <u>however</u>, that the payment of the annual payment shall be forgiven by the Lender [Super Rite] if the Lender determines that the Borrower [petitioner] is in compliance with, and shall not have materially breached or then be in uncured default under, that certain Supply and Requirements Agreement [April 16, 1999 supply agreement] of even date herewith among the Borrower and Lender. * * *

If the form of the April 15, 1999 note were to control, such form would appear to support petitioner's arguments.  However, we are not bound by the form of the April 15, 1999 note.  See <u>Knetsch v. United States</u>, <u>supra</u>.  The substance of the bargain between petitioner and Super Rite at the time the $1.5 million at

issue was transferred to petitioner governs our resolution of whether such transfer constitutes a loan.  See id.

Based upon our examination of the entire record before us, we find that the substance of the bargain between petitioner and Super Rite at the time of the transfer to petitioner of the $1.5 million at issue[17] was that petitioner's obligation for a given annual period to make the annual payment set forth in the April 15, 1999 note would not arise unless and until it materially breached the April 16, 1999 supply agreement with respect to such period.  On that record, we find that at the time of the transfer to petitioner of the $1.5 million at issue petitioner did not have an unconditional obligation to make each of the annual payments set forth in the April 15, 1999 note.[18]  We further find

---

[17]Although the April 15, 1999 note is dated Apr. 15, 1999, it was not until around May 4, 1999, that petitioner received the $1.5 million at issue.  See supra note 10.

[18]We have found, based on the testimony of Joseph Della Noce (Mr. Della Noce), an officer of Rich Foods, the parent of Super Rite at the time of the transaction at issue, that Super Rite expected that the customer would satisfy the minimum annual purchase requirement set forth in the supply agreement, but that Super Rite nonetheless required the customer to execute a note payable to it in the amount of any advanced funds in order to facilitate repayment of all or a portion of such funds in the event that the customer did not satisfy such minimum annual purchase requirement or otherwise materially breached the supply agreement.  We have also found, based on Mr. Della Noce's testimony, that Super Rite intended that the customer's obligation to repay funds that it advanced to such customer would arise only if the customer did not satisfy the minimum annual purchase requirement set forth in the supply agreement or otherwise materially breached that agreement.

petitioner's reliance on <u>Erickson Post Acquisition, Inc. v. Commissioner</u>, <u>supra</u>, to be misplaced. That case is materially distinguishable from the instant case. In <u>Erickson Post Acquisition, Inc.</u>, the Court found that, at the time the taxpayer received the funds in question, the taxpayer had an unconditional obligation to repay the full amount of such funds and that "Not only was the transaction in form a loan but, under the circumstances of this case, that was also its substance." <u>Erickson Post Acquisition, Inc. v. Commissioner</u>, <u>supra</u>. Unlike the findings of the Court with respect to the obligation of the taxpayer in <u>Erickson Post Acquisition, Inc.</u>, we have found that, at the time of the transaction at issue, the substance of that transaction was that any obligation of petitioner under the April 15, 1999 note did not arise unless and until there was a material breach by petitioner of the April 16, 1999 supply agreement and that petitioner did not have an unconditional obligation to make each of the annual payments set forth in the April 15, 1999 note.[19]

---

[19]On the record before us, we reject petitioner's argument that certain alleged loan transactions between it and SUPERVALU that occurred after Super Rite advanced the $1.5 million at issue to petitioner (subsequent transactions) support its position that the $1.5 million at issue constitutes a loan. Assuming arguendo that we had found that the subsequent transactions constitute loans, those subsequent transactions do not control whether at the time petitioner received the $1.5 million at issue petitioner had an unconditional obligation to make each of the annual payments set forth in the April 15, 1999 note. See <u>Haag v.</u>

(continued...)

We turn now to petitioner's reliance on the statement in Commissioner v. Indianapolis Power & Light Co., 493 U.S. 203, 210 (1990), that "In determining whether a taxpayer enjoys 'complete dominion' over a given sum, * * * The key is whether the taxpayer has some guarantee that he will be allowed to keep the money." According to petitioner,

> There was no guarantee in April of 1999 that the Petitioner would meet the purchase obligations or other obligations under the Supply and Requirements Agreements for the ensuing six years. Accordingly, there was no guarantee that future debt service payments would be forgiven. * * *
>
>      *      *      *      *      *      *      *
>
> Even if one assumes that on the anniversary date the Petitioner had met the purchase requirements under the Supply and Requirements Agreement, there was still no guarantee that the debt service payment would be forgiven because the Note required "that the borrower is in compliance with, and shall not have materially breached or then be an uncured default, under the Supply Agreement" * * *.

Petitioner's contentions in reliance on Commissioner v. Indianapolis Power & Light Co., supra, miss the point that the Supreme Court established in that case. The issue presented in Indianapolis Power & Light Co. was whether certain deposits that the taxpayer, a power company, received from its customers were income. In resolving that issue, the Supreme Court analyzed whether the taxpayer enjoyed "complete dominion" over such

_____

[19](...continued)
Commissioner, 88 T.C. 604, 616 (1987), affd. without published opinion 855 F.2d 855 (8th Cir. 1988).

deposits.  The Supreme Court held that the taxpayer did not have "complete dominion" over the deposits in question because it did not have "some guarantee" that it would be allowed to keep them. Id.  According to the Supreme Court, by making timely payments of their respective utility bills, the customers, and not the taxpayer, controlled whether the taxpayer would be required to return the deposits that it received from such customers.  Id. at 209.  In contrast to the situation presented in Indianapolis Power & Light Co., Super Rite did not have control over the events that petitioner asserts would have constituted a material breach by it of the April 16, 1999 supply agreement and that would have required petitioner to repay a portion or all of the $1.5 million at issue that it received from Super Rite.[20]  See

---

[20]According to petitioner, it would have materially breached the April 16, 1999 supply agreement upon the occurrence of any of the following events set forth in paragraph 5 of that supply agreement:

> (i) upon the failure by the Retailer to make payment to Super Rite in accordance with Section 2 hereof for goods delivered hereunder; (ii) immediately upon the filing of a petition for relief by the Retailer in a voluntary proceeding under applicable federal or state bankruptcy law or like laws for the protection of debtors or upon the application of the Retailer to any court or administrative agency of competent jurisdiction for the appointment of a receiver or trustee for the administration of the Retailer's affairs; (iii) upon the filing of a petition for relief with respect to the Retailer in an involuntary proceeding under applicable federal or state bankruptcy law or like laws for the protection of debtors or upon the application by a third party to any court or adminis-
>                                                   (continued...)

id.; see also Herbel v. Commissioner, 106 T.C. 392, 416-417 (1996), affd. 129 F.3d 788 (5th Cir. 1997). On the record before us, we find that petitioner had "some guarantee" that, for each annual period covered by the April 16, 1999 supply agreement and the corresponding April 15, 1999 note, it would be allowed to keep the amount of the annual payment set forth in that note as long as, for each such period, it lived up to its end of the bargain by not materially breaching the April 16, 1999 supply agreement.[21] See Commissioner v. Indianapolis Power & Light Co.,

_____

[20](...continued)
trative agency of competent jurisdiction for the appointment of a receiver or trustee for the administration of the affairs of the Retailer, if an order for relief shall be entered and continued unstayed in effect for thirty (30) days or such petition or application shall continue undismissed for sixty (60) days; (iv) following the breach of any obligation of the Retailer hereunder, if such breach is not cured within thirty (30) days following notice thereof to the breaching party; (v) following the default by Retailer in the performance of or compliance with any material contract, instrument or agreement, including, without limitation, any lease of real property, any material lease of personal property or any promissory note, instrument or agreement evidencing or in respect of any indebtedness for borrowed money or any security therefor, if such default is not cured within any applicable period of grace, or (vi) immediately upon the occurrence of a material adverse change in the condition (financial or otherwise), business or prospects of the Retailer or any guarantor of the Retailer's liabilities and obligations hereunder. * * *

[21]On the record before us, we reject petitioner's contention that if Super Rite had commenced a bankruptcy proceeding, petitioner would have been in default under the April 16, 1999 supply agreement. Pursuant to the April 16, 1999 supply agreement, the
(continued...)

493 U.S. at 209, 212; <u>Herbel v. Commissioner</u>, <u>supra</u>.

Based upon our examination of the entire record before us, we find that the $1.5 million at issue does not constitute a loan.  On that record, we further find that that amount is includable in petitioner's gross income for the year at issue.

We have considered all of the contentions and arguments of the parties that are not discussed herein, and we find them to be without merit, irrelevant, and/or moot.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>for respondent</u>.

---

[21](...continued)
commencement of a bankruptcy proceeding by Super Rite merely would have granted petitioner the option of canceling the April 16, 1999 supply agreement.  Thus, it was within the control of petitioner, and not Super Rite, to cancel that supply agreement in the event that Super Rite were to commence a bankruptcy proceeding.