**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

WESTPAC PACIFIC FOOD; SAVE
MART SUPERMARKETS, INC., TAX
MATTERS PARTNER,
          *Petitioners-Appellants,*

       v.

COMMISSIONER OF INTERNAL
REVENUE,
          *Respondent-Appellee.*

No. 02-71041

Tax Ct. No.
12400-99

OPINION

Appeal from a Decision of the
United States Tax Court

Argued and Submitted
September 15, 2004—San Francisco, California

Filed June 21, 2006

Before: James L. Oakes,* Andrew J. Kleinfeld, and
Consuelo M. Callahan, Circuit Judges.

Opinion by Judge Kleinfeld

---

*The Honorable James L. Oakes, Senior Circuit Judge of the United
States Court of Appeals for the Second Circuit, sitting by designation.

## COUNSEL

Thomas F. Carlucci, Foley & Lardner, LLP, San Francisco, California, for the appellants.

Audrea R. Tebbets, Department of Justice, Tax Division, Washington, D.C., for the appellee.

## OPINION

KLEINFELD, Circuit Judge:

We must decide whether cash paid in advance by a wholesaler to a retailer, in exchange for a volume commitment, is "gross income" under 26 U.S.C. § 61. In the grocery trade, these are called "advance trade discounts."

It is hard to think of a way to make money by buying things. A child may think buying things is how one makes money: he sees his father give a clerk a single piece of paper money, and receive in exchange the goods purchased, several pieces of paper money, and a number of coins. And a person may jokingly say to a spouse "I made $100 today" after buying something on sale for $100 off. But everyone knows these are merely amusing remarks, not real ways to make money.[1]

---

[1]About the only obvious way to make money by buying things is to buy back one's own debt at a discounted rate, as when a corporation purchases its outstanding bonds at less than par. *See United States v. Kirby Lumber Co.*, 284 U.S. 1, 2 (1931).

The facts outlined below sound more complicated than they are, so imagine a simple hypothetical. Harry Homeowner goes to the furniture store, spots just the right dining room chairs for $500 each, and says "I'll take four, if you give me a discount." Negotiating a 25% discount, he pays only $1,500 for the chairs. He has not made $500, he has spent $1,500. Now suppose Harry Homeowner is short on cash, and negotiates a deal where the furniture store gives him a 20% discount as a cash advance instead of the 25% off. This means the store gives him $400 "cash back" today, and he pays $2,000 for the four chairs when they are delivered shortly after the first of the year. Harry cannot go home and say "I made $400 today" unless he plans to skip out on his obligation to pay for the four chairs. Even though he receives the cash, he has not made money by buying the chairs. He has to sell the chairs for more than $1,600 if he wants to make money on them. The reason why the $400 "cash back" is not income is that, like a loan, the money is encumbered with a repayment obligation to the furniture store and the "cash back" must be repaid if Harry does not perform his obligation.

This case is that simple, except that it involves a little more math and a lot more money. The taxpayer promised to buy a lot of items and received cash in advance as its discount on its future, high-volume purchases. Using accrual accounting, the taxpayer treated the up front cash discount as a liability when it was received, just like a loan. As goods were sold, the taxpayer applied the discount *pro rata* to the full purchase price it paid.[2] The net effect was that Westpac reduced its cost

---

[2] The government argues that there is no evidence that Westpac was actually purchasing the goods at the full list price. We give this argument very little credence. The Tax Court — and each party to the various contracts — consistently treated the advance "payments" as discounts on the volume Westpac agreed to purchase. Further, Westpac actually repaid the *pro rata* portion of the advance discount on the contracts for which it did not meet the volume requirement. In short, nothing in the record supports the government's argument that the up front money was a payment for entering into the contracts or anything other than an advance discount.

of goods sold and increased its reported profit (and thus its taxable income). The taxpayer reported *pro rata* amounts without matching sales as miscellaneous or other income.

The government concedes, and the Tax Court agreed, that Westpac's method was consistent with generally accepted accounting principles. "Revenue is usually recognized when the earning process is complete and an exchange has taken place."[3] Nevertheless, the Tax Court concluded that the cash discount received in advance was income, noting that tax principles do not serve the same purposes as accounting principles, such as reflecting to shareholders how their company is performing.

A company would indeed have a major problem if it accounted to its shareholders as the Tax Court would have it account to the government. Were a company to get very significant amounts of up front cash discounts on its obligation to purchase goods in the future and tell stockholders and prospective stock purchasers that it had "made" this much "income," investors would be sorely disappointed to learn that all the money had to be paid back if their company did not sell all the goods it had promised to sell in the future. The company would be like Harry Homeowner claiming to have "made" $400 when he received his cash advance discount on the four chairs. Harry might have to spend the night on the couch, but the CEO could spend the night in jail.[4]

## FACTS

Three grocery store chains — Raley's, Save Mart, and Bel Air — organized the taxpayer, Westpac, as a partnership to purchase and warehouse inventory. Westpac is an accrual basis taxpayer.

---

[3]Martin A. Miller, *Comprehensive GAAP Guide 1990* § 36.51 (1989).
[4]*See*, e.g., 15 U.S.C. § 78j(b).

During 1990 and 1991, Westpac made four contracts to buy inventory and receive cash in advance: (1) lightbulbs from GTE Sylvania; (2) Hallmark cards from Ambassador; (3) bows, wrapping paper, and other products from American Greetings; and (4) spices from McCormick. Under each contract, Westpac promised to buy a minimum quantity of merchandise and received a volume discount in the form of cash up front. If Westpac bought too few lightbulbs, spices, greeting cards, etc., then it was obligated to pay back the cash advance *pro rata*. Conversely, Westpac's obligation to repay the cash advance was extinguished if Westpac purchased the required volume. Westpac made other promises as well, such as exclusivity and shelf space, but the volume purchased determined whether it had to refund the cash advance and, if so, how much it had to refund.

### GTE Sylvania Contract

In July of 1990, Westpac made a deal with the Sylvania Lighting division of GTE Products Corp. to (1) make GTE Sylvania its exclusive lightbulb supplier for Westpac and its member stores for four years; (2) "aggressively and regularly" advertise and promote GTE Sylvania's products; (3) dedicate on average at least 12 lineal feet of shelf space to GTE Sylvania's products in its member stores; and (4) purchase $17 million in lightbulbs during the term of the agreement. Given Westpac's volume purchase commitment, GTE Sylvania agreed to pay Westpac $1.1 million as an "unearned advance allowance." GTE Sylvania paid this to Westpac by check, and agreed to pay Westpac another $200,000 on the first, second, and third anniversaries of the agreement, provided that GTE Sylvania was satisfied with Westpac's warehouse distribution arrangement. The contract refers to the total $1.7 million in payments as the "Westpac Allowance" and contains the following clause:

> Upon termination of this Agreement, Westpac will reimburse GTE Sylvania on a pro-rated basis for any

portion of the Westpac Allowance advanced to Westpac but not earned due to the failure by Westpac to purchase at least $17.0 million in lamps.

During Westpac's 1991 tax year, GTE Sylvania paid the first $200,000 to Westpac.

Westpac could not resell enough lightbulbs to meet the minimum volume the contract called for, so it terminated the arrangement in October of 1994. Westpac's termination letter acknowledged its obligation to pay back a pro-rated portion of the Westpac Allowance, and it repaid $861,857 to GTE Sylvania in December.

### Ambassador Contract

In August of 1990, Westpac agreed to buy more than $61 million worth of greeting cards and like items from Ambassador, and Ambassador agreed to pay Westpac $4,572,000 up front as a volume discount. The contract provided for *pro rata* reimbursement of the cash advance if Westpac did not meet its volume commitment. The parties agreed on an addendum in 1994, increasing Westpac's volume commitment and obligating Ambassador to additional cash advances.

In 1997, Westpac and Ambassador discussed termination because of Westpac's inadequate purchasing volume, and Ambassador sent Westpac a letter stating how much of the cash advance Westpac would be required to repay upon termination. This letter included a table listing (1) the amount of advances Westpac had received under the contract; (2) the volume of purchases Westpac had achieved through December of 1996; and (3) the *pro rata* repayment amount for the advances, which corresponded to the percentage of the volume Westpac had promised to purchase. The parties ultimately decided against terminating the contract.

### *American Greetings Contract*

In January of 1991, Westpac's assignor, Save Mart, and American Greetings agreed that American Greetings would supply counter cards, tray packs, wraps, bows, and similar products. The company would give American Greetings the exclusive right to supply these goods, a designated amount of shelf space, and would continue the arrangement until it had spent $17,970,000 on American Greetings products. American Greetings initially agreed to provide credits and discounts, but the agreement was later changed to $1,250,000 cash up front "in lieu of periodic volume discounts."

On this deal, too, the volume requirement was not met and the contract was terminated by mutual consent. Although the contract did not have an explicit provision for *pro rata* reimbursement of the up front, cash payment, both parties recognized the repayment obligation, evidently because of the customs of the grocery trade. American Greetings calculated Westpac's *pro rata* repayment obligation at $406,243, and Westpac paid it. The check stub read "repayment of contract adv[ance]."

### *McCormick Contract*

In March of 1991, Westpac and McCormick & Co. agreed that McCormick would supply spices, extracts, seasonings, and such, and Westpac would buy at least $50 million worth. McCormick provided Westpac $1 million in product without charge and $5 million cash up front, with additional cash payments to be made as Westpac met periodic volume goals. The contract obligated Westpac "to repay any unearned prepaid allowances on a *pro rata* basis" in the event Westpac failed to satisfy the entire $50 million volume purchase commitment. Nothing in the record reflects that this contract was ever terminated or that Westpac made any *pro rata* repayments.

### *Westpac's Tax Reporting*

In accord with standard accounting principles, Westpac accounted for the up front cash as a liability at the time it received the cash.[5] The cash advance got translated into taxable income through Westpac's inventory accounting. As Westpac purchased the goods for which it had the volume obligations, it subtracted *pro rata* portions of the advance cash discounts from what it paid. This had the effect of reducing the cost of goods sold (and increasing the taxable profits from sales) by the amount of the cash advances attributable to the goods sold.

The government took the position that Westpac and Save Mart under-reported over $5.5 million in gross income for 1990 and over $4.9 million for 1991 because they did not report the cash advances as gross income. Westpac filed a petition for readjustment and the government opposed it. Relying on *Commissioner of Internal Revenue v. Glenshaw Glass Co.*,[6] the Tax Court held that the cash advance discounts were "income" under section 61 of the Internal Revenue Code.[7] Westpac timely filed this appeal.

The sole issue before us is whether advance trade discounts constitute gross income when received. We hold that they do not and reverse the Tax Court.

### *ANALYSIS*

There are no disputed findings of fact in this case, just the question of law: whether "advance trade discounts" subject to

---

[5]*See* Charles T. Horngren & Walter T. Harrison, *Accounting* 1134 (1989) ("Unearned revenues are liabilities because the business that receives the cash owes the other party goods or services to be delivered later.").

[6]*CIR v. Glenshaw Glass Co.*, 348 U.S. 426 (1955).

[7]26 U.S.C. § 61.

repayment if volume requirements are not met are income when received. We review the Tax Court's decision on questions of law *de novo*.[8]

## A. Waiver

[1] The government argues that Westpac waived the argument that the advances were not income because that is not the argument Westpac made to the Tax Court. We have examined Westpac's trial brief to the Tax Court and cannot agree. Westpac stated the issue as whether "the advance trade discounts received by Petitioner [should] be recognized as income for federal income tax purposes" in the year received, or, as the government claimed, "as the associated inventory was sold." The government argues that Westpac's argument to the Tax Court focused on *when* the cash was income rather than *whether*, but that is too fine a distinction. Westpac has never denied that its income tax should be higher to reflect the cash received in advance. Rather, Westpac maintains that the advance trade discounts are not income when received but adjustments to the cost of goods sold. Either way, the central question is *when* Westpac has to recognize the income for tax purposes, so Westpac's argument on appeal was sufficiently preserved.

## B. Is A Discount in the Form of A Cash Advance Income When Received?

[2] There appears to be no circuit court authority on point, but the Supreme Court authorities bracketing the question compel our answer: Cash advances in exchange for volume purchase commitments, subject to *pro rata* repayment if the volume commitments are not met, are not income when received.

---

[8]*Milenbach v. CIR*, 318 F.3d 924, 930 (9th Cir. 2003).

**[3]** The statutory definition of gross income is expansive.[9] *Commissioner v. Glenshaw Glass Co.* held that punitive damages received by a successful litigant were "income" because they were "accessions to wealth, clearly realized, and over which the taxpayers have complete dominion."[10] The government argues that the cash advances in this case fit that definition because Westpac had "complete dominion" over the money. It did not have to put the cash in a trust account and could spend the money as it chose. But that leaves out *sine qua non* of income: that it be an "accession to wealth." One may have "complete dominion" over money but it does not become income until it is an "accession to wealth." That is why borrowed money is not income, even though the borrower has "complete dominion" over the cash.[11] "Because of this [repayment] obligation, the loan proceeds do not qualify as income to the taxpayer."[12]

The Supreme Court decisions bracketing this case are *CIR v. Indianapolis Power & Light Co.*[13] on one side, and *Automobile Club of Michigan v. CIR*[14] and *Schlude v. CIR*[15] on the other.

**[4]** *Indianapolis Power* held that utility customers's security deposits are not income to the utility because of the obligation to repay the money when service ended.[16] The decision

---

[9] 26 U.S.C.A. § 61(a).

[10] *See Glenshaw Glass*, 348 U.S. at 431.

[11] *See CIR v. Indianapolis Power & Light Co.*, 493 U.S. 203, 207 (1990) (Explaining that "it is well settled that receipt of a loan is not income to the borrower.").

[12] *CIR v. Tufts*, 461 U.S. 300, 307 (1983).

[13] *CIR v. Indianapolis Power & Light Co.*, 493 U.S. 203 (1990).

[14] *Automobile Club of Michigan v. CIR*, 353 U.S. 180 (1957).

[15] *Schlude v. CIR*, 372 U.S. 128 (1963).

[16] *Indianapolis Power*, 439 U.S. at 211-12.

analogizes the security deposits to loans because of the repayment obligation.[17]

**[5]** *Automobile Club of Michigan* holds that prepaid membership dues are income when received, despite the association's obligation to provide membership services — maps, tire repair and the like — during the subsequent year.[18] The reason was that *pro rata* application of the dues to each month "bears no relation to the services" the club had to perform.[19] Drivers do not call AAA once a month to repair a flat or send a map, and AAA is entitled to keep the membership dues regardless of whether the member ever requests any goods or services. *Schlude* held that cash paid to a dance studio for ballroom dancing lessons was income when received, not when the lessons were provided.[20] The Court applied *Automobile Club of Michigan*, because the money was not refundable and the studio could keep it even if the student did not show up for dance lessons.[21]

**[6]** This case is like *Indianapolis Power*, not *Automobile Club of Michigan* or *Schlude*. The cash advance trade discounts are like the security deposits in that they are subject to repayment, and unlike the membership dues in that the recipient cannot keep the money regardless of what happens after receipt. Westpac could only retain the full, up front trade discount if it met the volume requirements. Like the security deposit, the cash advance is subject to repayment. The only difference is that the repayment amount in this case may not be the full amount advanced by the vendor, but that is because the repayment amount is reduced *pro rata* to the extent Westpac fails to fulfill its volume commitment.

---

[17]*See id*. at 208.

[18]*Automobile Club of Michigan*, 353 U.S. at 712-13.

[19]*Id*. at 712.

[20]*Schlude*, 372 U.S. at 137.

[21]*See id*. at 130.

**[7]** Because the taxpayer here has to pay the money back if the volume commitments are not met, it is not an "accession to wealth" as required by *Glenshaw Glass*. Westpac either has to buy a specified volume of goods for more than it would otherwise pay or pay back the money, just like Harry Home-owner. Thus the cash advance discounts are, like a loan or customer security deposit, liabilities rather than income when received.

The Tax Court found that Westpac's accounting for the cash advances as affecting cost of goods sold complied with generally accepted accounting principles, but correctly held that accounting rules are not necessarily controlling for tax purposes.[22] The regulations require that inventory accounting conform to best accounting practices *and* clearly reflect income.[23] But that does not go far enough to transform the cash into "income" in the face of *Indianapolis Power*. We cannot agree with the government that Westpac's "unfettered use" of the money makes it income, because it was not an accession to wealth. Rather, it was merely an advance against an obligation, repayable if the obligation was not performed.

**[8]** Our decision in *Milenbach*[24] is more analogous to this case than *Schlude* or *Automobile Club of Michigan*. In *Milen-*

---

[22]*See American Automobile Ass'n v. United States*, 367 U.S. 687, 693 (1961) ("[t]o say that in performing the function of business accounting the method employed by the Association 'is in accord with generally accepted commercial accounting principles and practices' . . . is not to hold that for income tax purposes it so clearly reflects income as to be binding on the Treasury.").

[23]*See* 26 C.F.R. § 1.471-2(a):

  (a)  Section 471 provides two tests to which each inventory must conform:

    (1)  It must conform as nearly as may be to the best accounting practice in the trade or business, and

    (2)  It must clearly reflect the income.

[24]*Milenbach v. CIR*, 318 F.3d 924 (9th Cir. 2003).

bach, a Los Angeles entity loaned the Oakland Raiders $6.7 million, repayable only out of revenue from the luxury suites to be built in the future, to induce the team to move to Los Angeles.[25] Even though it was a non-recourse loan with no certain repayment date, and even though the Raiders neither built the suites nor made any payments, we held that the $6.7 million was not income because the repayment obligation was genuine.[26] The case at bar is easier than *Milenbach* because the cash advances here are more plainly subject to repayment in calculable amounts by a set date. Westpac not only had a duty to repay the discounts, it actually did repay them when it did not meet the volume commitments. When Westpac did buy the required volume of goods, it paid list price rather than a discounted price, and realized the income for tax purposes.

**[9]** It works out about the same as with Harry Homeowner: He has to sell the chairs for more than he paid in order to make money on them. Westpac had to sell the lightbulbs, ribbons, greeting cards, and such for more than they paid in order to make money on them. It remains exceedingly difficult to make money merely by buying things. Westpac did not get any richer when it received its volume discount in the form of cash up front than Harry Homeowner did when he got the $400 from the furniture store. There was no accession to wealth when Westpac got the cash, just an increase in cash assets offset by an equal liability for the advance trade discounts.

**REVERSED**.

---

[25]*See id.* at 929.
[26]*See id.* at 931.