

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-20-2007

# Karns Prime Fancy v. Comm IRS

Precedential or Non-Precedential: Precedential

Docket No. 06-1031

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"Karns Prime Fancy v. Comm IRS" (2007). *2007 Decisions.* Paper 649.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/649

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 06-1031

———


KARNS PRIME & FANCY FOOD, LTD.,
                                        Appellant
v.

COMMISSIONER OF INTERNAL REVENUE


———

On Appeal from the United States Tax Court
(No. 0090-1: 04-906)
Tax Court Judge: Hon. Carolyn P. Chiechi

———

Argued March 5, 2007

Before: SLOVITER, AMBRO, Circuit Judges,
and BRODY,[*] District Judge

(Filed: July 20, 2007)

———

Steven J. Schiffman
John D. Sheridan     (Argued)
Serratelli, Schiffman, Brown & Calhoun
Harrisburg, PA l7110-9670

    Attorneys for Appellant

---

[*] Hon. Anita B. Brody, United States District Court for the Eastern District of Pennsylvania, sitting by designation.

Richard Farber
Bethany B. Hauser   (Argued)
United States Department of Justice
Washington, DC 20044

        Attorneys for Appellee

————

OPINION OF THE COURT
————

SLOVITER, Circuit Judge.

        The distinction between a loan and an advance payment
for the purpose of whether the funds received are to be treated as
"income" subject to federal income tax is not always apparent on
the face of the documents.  Instead, the issue is to be determined
after an examination of "all the facts and circumstances."
Comm'r v. Indianapolis Power & Light Co., 493 U.S. 203, 207
(1990) (internal citation and quotation marks omitted).  The
applicable law is not uncertain.  It is "settled that receipt of a
loan is not income to the borrower."  Id.  On the other hand,
funds received "are taxable as income upon receipt if they
constitute advance payments . . . ."  Id.  The courts'
determinations as to which side of the line a particular payment
falls have not always been consistent.  In the appeal before us we
must decide whether the Tax Court erred in characterizing the
payment received by appellant as income, for which it had been
issued a notice of deficiency.

**I.**

        Appellant Karns Prime & Fancy Food, Ltd., is a
Pennsylvania corporation that operates grocery stores in the
Harrisburg, Pennsylvania area.  During the taxable year ended
January 30, 2000, Karns operated five grocery stores in
Harrisburg, Pennsylvania.  Karns' principal supplier was Super
Rite Foods, Inc., a wholly owned subsidiary of Rich Foods, Inc.
Karns' CEO, Scott Karns, prepared a capital budget in 1998 and
determined that Karns required $1.5 million for capital

2

improvements in the coming years.  Karns approached Dale Conklin, President of Super Rite, about borrowing funds from Super Rite.  Super Rite did not generally make loans to its customers, but would, from time to time, make funds available to "certain of its creditworthy and strategically important customers."  Appellant's Br. at 3.  Due to Karns' loan obligations with its primary lender – PNC Bank – Karns requested and obtained a waiver from PNC in order to secure the funds that Super Rite was willing to provide.

Super Rite requires customers to whom it provides financial assistance to enter into a Supply and Requirements Agreement ("Supply Agreement") whereby the customer, in this case Karns, agrees to purchase a minimum dollar amount of products from Super Rite.  Super Rite also requires the customer to execute a promissory note payable to Super Rite in the amount of the funds it provided.  Thus, Super Rite agreed to make $1.5 million immediately available to Karns and Karns executed a promissory note to Super Rite on April 15, 1999.  Karns signed the Supply Agreement on April 16, 1999.[1]

Pursuant to that agreement, Karns agreed to repay the note in six annual payments of $250,000.  Significantly, the agreement provided that if Karns met the supply requirement for the previous calendar year at issue by purchasing the stipulated amount of Super Rite products, the $250,000 due and owing for that year would be forgiven.  Karns received the $1.5 million on May 4, 1999.  Karns recorded the note on its books as a long-term note payable.  Super Rite recorded the note as an asset and amortized the note monthly over the six-year period.

### A.  The Supply and Requirements Agreement

---

[1] Although there is apparently an inconsistency in the record as to the specific dates of the note and supply agreement, the Tax Court stated that it is clear from the record that they "were entered into around the same time and were interdependent." Karns Prime & Fancy Food, Ltd. v. Comm'r, 90 T.C.M. (CCH) 357, 360 n.9 (2005).

3

The Supply Agreement provided that Super Rite would be the principal wholesaler for all of Karns' purchased products in the Harrisburg geographical area. Karns agreed to purchase $16 million worth of product annually from Super Rite. In addition, Karns agreed to Super Rite's general policies and practices in effect, with respect to, for instance, product pricing (Karns paid a 2.5% markup for grocery products, 3% for dairy products, and 3.5% for frozen products), billing and payment terms, and returns and credits for purchased products. Under the terms of the Agreement, Karns was given seven days to make payment for its product purchases. Failure to do so constituted default, and Super Rite had the right to suspend shipments during the term of default. Any default under the Supply Agreement also constituted a default under the note, thus requiring the balance under the note to become due immediately.

Under the terms of the Supply Agreement, Super Rite could cancel the Agreement if Karns filed for bankruptcy, failed to pay in accordance with the agreement, or was in default of any "material contract, instrument or agreement, including, without limitation, any lease of real property, any material lease of personal property or any promissory note, instrument or agreement evidencing or in respect of any indebtedness for borrowed money or any security therefor . . . ." App. at 52. Karns had the right to cancel the Agreement in the event that Super Rite filed for bankruptcy protection. Karns granted Super Rite a security interest in its assets, including inventory, accounts, equipment, and proceeds. Karns agreed to make its internal financial statements available within ninety days of each fiscal quarter and a financial statement prepared by its independent accountant every six months. Finally, Karns gave Super Rite a right of first refusal if Karns' shareholders sold either the corporation or its assets to a third party.

### B. The Note

The promissory note had a face value of $1.5 million. Interest on the unpaid balance was to be paid at prime plus 1%. The note was to be repaid in six annual payments of $250,000 commencing April 16, 2000 and continuing on the third Friday of each April thereafter up to and including April 16, 2005. The

4

note also provided the following:

> payment of the annual payment <u>shall be forgiven</u> by the Lender if the Lender determines that Borrower is in compliance with, and shall not have materially breached or then be in uncured default under, that certain Supply and Requirements Agreement of even date herewith among the Borrower and Lender.  The entire unpaid and unforgiven principal balance hereof shall be due and payable, if prior to April 16, 2005, Borrower ceases, for any reason, to use Lender as its primary food supplier.

App. at 49 (emphasis added).

Karns spent $750,000 of the $1.5 million received from Super Rite on capital improvements and temporarily invested the balance in certificates of deposit.  The CDs were then pledged to PNC as collateral for a new $960,000 loan from PNC.  That $960,000 was in turn invested in further capital improvements.

In August 1999, SuperValu, Inc. acquired Rich Foods (parent of Super Rite).  Soon thereafter, Karns decided to relocate one of its stores.  In order to satisfy the new lessor's concerns, Karns requested that SuperValu guarantee its new lease.  On or about January 25, 2000, SuperValu agreed to guarantee Karns' lease; in return the parties amended the April 16, 1999 Supply Agreement to reflect the guarantee and Karns entered into several agreements with SuperValu, including, inter alia, an agreement that granted SuperValu a security interest in some of Karns' assets.

Karns satisfied the Supply Agreement for the periods ending April 16, 2000 and April 16, 2001, "and otherwise complied with, did not materially breach, and was not in uncured default under that . . . agreement."  <u>Karns Prime & Fancy Food, Ltd. v. Comm'r</u>, 90 T.C.M. (CCH) 357, 361 (2005).  Because Karns fulfilled the purchase requirements and the other covenants, the required annual payments of $250,000 on the promissory note were forgiven.  In its January 30, 2001, and January 30, 2002, tax returns Karns reported the debt forgiveness of $250,000 as "Other Income – Reduction of

5

Supplier Note Agreement." App. at 39.

In 2001, Karns sought an additional $300,000 from SuperValu in order to facilitate a move to a new location vacated by Fleming Foods, a food wholesaler who declared bankruptcy. Karns needed the funds to buy out the remainder of its existing lease and to purchase inventory and fixtures at the new location. SuperValu agreed, and Karns executed a promissory note to SuperValu on March 9, 2001 in the amount of $300,000 with interest at 10.7% per year. Karns executed new agreements, including a second amendment to the Supply Agreement, which increased the annual purchase requirements from Super Rite from $16 to $21 million. The note called for debt service payments to be made annually from March 9, 2002 through March 9, 2005, but the new Supply Agreement did not extend the term of the original Supply Agreement beyond April 16, 2005.

Karns met the purchase requirement of $21 million for the period ending March 9, 2002, and therefore did not pay the $250,000 due annually under the note. For the period ended March 9, 2003, Karns purchased only $19.8 million from SuperValu, and it had to pay $4,929.19 toward the annual payment due under the March 9, 2001 note.

## II.

The Commissioner of the Internal Revenue Service mailed a notice of deficiency to Karns for its federal income tax year ending January 30, 2000, in the amount of $486,355 on October 24, 2003. The basis for the claimed deficiency was Karns' failure to include the $1.5 million payment from Super Rite as income in its tax return. Karns timely petitioned the Tax Court for a redetermination of the tax deficiency. The Tax Court had jurisdiction pursuant to 26 U.S.C. §§ 6213(a), 6214, and 7442. After a trial, the Court entered its decision on October 5, 2005, holding that the $1.5 million payment to Karns was not a loan and thus was includable in Karns' gross income. Karns, 80 T.C.M. at 365. Karns filed a timely notice of appeal to this court. We have jurisdiction pursuant to 26 U.S.C. § 7482(a)(1).

6

## III.

The statutory definition of gross income includes income "from whatever source derived." 26 U.S.C. § 61(a). The Supreme Court has defined "income" as "undeniable accessions to wealth, clearly realized, and over which the taxpayers have complete dominion." Comm'r v. Glenshaw Glass Co., 348 U.S. 426, 431 (1955). "In determining whether a taxpayer enjoys 'complete dominion' over a given sum . . . . [t]he key is whether the taxpayer has some guarantee that he will be allowed to keep the money." Comm'r v. Indianapolis Power & Light Co., 493 U.S. 203, 210 (1990).

Generally, the receipt of a loan is not includable as gross income, because the recipient of the loan has an obligation to repay the amount loaned. Id. at 207-08. The loan proceeds are not income to the taxpayer. Comm'r v. Tufts, 461 U.S. 300, 307 (1983). A key question is whether, at the time of receipt of the funds, the recipient of the loan was unconditionally obligated to make repayment. To determine whether a given transaction constitutes a loan, the substance, rather than the form, of the transaction is controlling. Knetsch v. United States, 364 U.S. 361, 365-66 (1960).

Most of the cases grappling with the issue have focused on the treatment of advance payments for purposes of taxation, probably because that was the factual pattern before the Supreme Court in Indianapolis Power, the leading decision on this issue.

In Indianapolis Power, the Indianapolis Power & Light Company ("IPL") required "certain customers to make deposits with it to assure payment of future bills for electric service." 493 U.S. at 204. Although IPL commingled the funds received with other receipts and did not segregate them, it did not treat the deposits as income on its books but instead carried them as current liabilities. Id. at 205. The Internal Revenue Service ("IRS") had a different view of the transactions. It viewed the deposits as advance payments for electricity and assessed deficiencies on the ground that the deposits were gross income, taxable to IPL upon receipt. Id. at 204. The Tax Court disagreed with the IRS. Id. at 206. It held that the principal

7

purpose of the deposits was to serve as security rather than as prepayment of income.  Id.  The Court of Appeals for the Seventh Circuit affirmed.  Id.

The Supreme Court granted certiorari to resolve the conflict between the Seventh Circuit's decision and the Eleventh Circuit's decision in City Gas Co. of Florida v. Comm'r, 689 F.2d 943 (11th Cir. 1982).  In the course of its opinion, the Court provided guidance as to the distinction for taxation purposes between an advance payment and a loan.  The Court stated, "[i]n economic terms, . . . the distinction between a loan and an advance payment is one of degree rather than of kind." Indianapolis Power, 493 U.S. at 208.  It explained, "[t]he issue turns upon the nature of the rights and obligations that [are] assumed" when the transaction occurs.  Id. at 209.

The Court held that the advance deposits were not income to IPL when received, stating that "such dominion as IPL has over these customer deposits is insufficient for the deposits to qualify as taxable income at the time they are made."  Id. at 214. In holding that the deposits were not the economic equivalent of advance payments, the court noted that the customers who made the deposits "retain[ed] the right to insist upon repayment in cash," whereas the "individual who makes an advance payment retains no right to insist upon return of the funds; so long as the recipient fulfills the terms of the bargain, the money is its to keep."  Id. at 213.

In rejecting the IRS's attempt to analogize the IPL customers' security deposits to advance payments, the Court stated that although there was some similarity in that "[a]n advance payment, like the deposits at issue here, concededly protects the seller against the risk that it would be unable to collect money owed it after it has furnished goods or services," an advance payment does much more: "it protects against the risk that the purchaser will back out of the deal before the seller performs.  From the moment an advance payment is made, the seller is assured that, so long as it fulfills its contractual obligation, the money is its to keep."  Id. at 210.

Then, in the sentence that may be most applicable to the

8

situation before us, the Court stated, "Here, in contrast, a customer submitting a deposit [to IPL] made no commitment to purchase a specified quantity of electricity, or indeed to purchase any electricity at all." Id. at 210-211. Because IPL's right to keep the money depended upon the customer's purchase of electricity and that customer's decision to have the deposit applied to future bills, the Court noted that "IPL's dominion over the fund is far less complete than is ordinarily the case in an advance-payment situation." Id. at 211.

It is not easy to analogize the facts in Indianapolis Power to the facts in the case before us because the transactions and the positions of the parties are different. Nor is the Karns-Super Rite transaction the same as the advance payment transaction discussed in that case. However, if the Super Rite loan and the accompanying Supply Agreement are considered as an advance rebate, the analogy becomes clearer. Super Rite provided Karns with $1.5 million on condition that it purchase $16 million of Super Rite products a year. When it did so, it was relieved of the obligation to pay Super Rite $250,000. This agreement has all the indicia of an agreement to rebate $250,000 a year in advance. Some indication of the Court's view of a loan transaction such as the one before us can be gleaned from the Court's distinction in Indianapolis Power between a loan and an advance payment (taxable upon receipt). After stating that the taxability of the receipts must be determined by examining the relationship between the parties at the time of the deposit, the Court stated in the language quoted above, "so long as the recipient fulfills the terms of the bargain, the money is its to keep." Id. at 212. That is the key element in a transaction, such as the one before us, where the supplier gave cash in advance to a retailer in exchange for a volume commitment. As long as Karns fulfilled its terms of the bargain, i.e., to purchase $16 million of Super Rite's product, the money "[was] its to keep."

That was the basis for the decision of the Tax Court in this case that the funds Karns received were income, not a loan. In distinguishing Indianapolis Power from this case, the Tax Court noted that in Indianapolis Power the Supreme Court held that IPL did not have "'complete dominion' over the deposits in question because it did not have 'some guarantee' that it would

9

be allowed to keep them." Karns, 90 T.C.M. at 365. The Tax Court pointed out that the customers in Indianapolis Power, and not IPL itself, controlled whether IPL would keep the deposits. The Court contrasted that with the situation before us, stating: "[Karns] had 'some guarantee' that, for each annual period covered by the April 16, 1999 supply agreement and the corresponding April 15, 1999 note, it would be allowed to keep the amount of the annual payment set forth in that note as long as, for each such period, it lived up to its end of the bargain by not materially breaching the April 16, 1999 supply agreement." Id.

The logic of the Supreme Court's holding in Indianapolis Power applies here. According to that decision, if the taxpayer has some guarantee that it will be allowed to retain the funds, then it has complete dominion over the money. Indianapolis Power, 493 U.S. at 210. Such is the case here. Karns, and Karns alone, was at all times in control of whether it would meet the Supply Agreement. Therefore, the funds provided to Karns were in substance a projected rebate for products to be supplied, analogous to an advance payment, and as such were taxable income.

Karns argues that the transaction was a loan and not an advance payment because "any potential forgiveness under the loan was a condition subsequent." Appellant's Br. at 15. From Karns' perspective it had an unconditional obligation to repay the note; such obligation could only be expunged upon Karns' fulfillment of the Supply Agreement. However, this position exalts the form of the transaction over its substance. If Karns chose to meet the supply requirement, then Super Rite was obligated to forgive the indebtedness. Conversely, if Karns chose not to live up to the Supply Agreement the funds under the note would become due. Therefore, Karns' focus on the fact that it had an unconditional obligation to repay is misplaced. The point is that it was Karns, and not Super Rite, that was in control over whether the obligation would be triggered.

Although the dissent recognizes that the facts in Westpac Pacific Food v. Comm'r, 451 F.3d 970 (9th Cir. 2006), are distinguishable from those before us, we must discuss that

court's opinion because the result differs from the one that we reach today.  Westpac, a partnership of three grocery store chains, entered into four contracts with four different suppliers promising to buy a minimum quantity of merchandise and received a volume discount in the form of cash up front.  Id. at 972.  If Westpac failed to purchase the required quantity, it was obligated to refund the cash advance pro rata.  On the other hand, if it purchased the required quantity, its obligation to repay would be nullified.  Id.  The Court of Appeals held that "[c]ash advances in exchange for volume purchase commitments, subject to pro rata repayment if the volume commitments are not met, are not income when received."  Id. at 975.  The court reasoned that even though the recipient of a loan may have complete dominion over the funds received, such funds do not become "income" until there is an "accession to wealth."  Id.

The Westpac court realized that it had to contend with two decisions of the Supreme Court that suggested a contrary result.  In Automobile Club of Michigan v. Comm'r, 353 U.S. 180 (1957), the Court held that prepaid membership dues were properly characterized as income when received.  The reasoning behind the Supreme Court's holding was that pro rata application of the dues to each month had no bearing on the services that the club had to perform when called upon.  Similarly, in Schlude v. Comm'r, 372 U.S. 128 (1963), the Court held that cash paid to a dance studio for ballroom dancing lessons was income when received, not when the lessons were provided.  In a very brief statement constituting the totality of its analysis of these cases, the court in Westpac stated that its case "is like Indianapolis Power, not Automobile Club of Michigan or Schlude."  Westpac, 431 F.3d at 976.  The Westpac court ignored the discussion in Indianapolis Power, quoted at length above, that "so long as the recipient fulfills the terms of the bargain, the money is its to keep."  493 U.S. at 212.

The dissenting opinion of our colleague argues that the Supply Agreement and the note are not "one unitary advance rebate," because the Supply Agreement contained a liquidated damages clause, thereby proving that the loan did not "simply [function] as a mechanism for quick collection of any unearned rebates. . . . [but rather was] a bona fide loan. "  However, the

11

parties before us considered the Supply Agreement and the note to be "one unitary" device. For instance, in its brief Karns states, "Super Rite agreed to loan [sic] the $1.5 million requested by [Karns] and [Karns] executed a Promissory Note in favor of Super Rite in the amount of $1.5 million. At the same time, [Karns] agreed to enter into a Supply and Requirements Agreement." Appellant's Br. at 4 (emphasis added); see also Appellant's Br. at 8 ("Although the [n]ote is dated April 15, 1999 and the Supply Agreement April 16, 1999, the documents were executed at the same time."). Karns itself does not characterize the note as an independent transaction. Instead, it states that "[a] default under the Supply and Requirements Agreement would constitute a default under the [n]ote and the unpaid balance would become immediately due and payable." Id. at 5.

The dissent attempts to avoid the effect of that analysis by hypothesizing situations under which Super Rite "could cancel the Supply Agreement." The dissent speculates that Super Rite could cancel the Supply Agreement, and then Karns would have to pay. The dissent overlooks, or ignores, the provisions in the note requiring Super Rite to forgive the annual payment as long as Karns is in material compliance with its obligation under the Supply Agreement. See App. at 49 ("the annual payment shall be forgiven. . . ."). Thus, as we noted above, the control is in Karns' hands.

We disagree with the dissent's view that Super Rite had "immense latitude to cancel the Supply Agreement." The dissent relies on Section 5(vi) of the Agreement in making this point. However, the discretion referred to in that paragraph is hardly "broad." Indeed, it is quite narrow – cancellation can occur only "upon the occurrence of a material adverse change in the condition (financial or otherwise), business or prospects of the Retailer or any guarantor of the Retailer's liabilities and obligations hereunder." App. at 52 (emphasis added). Because the Agreement requires the change to be not only material, but also adverse, there is little room left for Super Rite's discretion.

In an attempt to show that Karns has no guarantee that it would be able to keep the $1.5 million, the dissent points to

12

Super Rite's option to terminate and calls the loan-forgiveness clause "illusory." However, a termination option does not make a promise illusory where, as here, one party "reserves the power to terminate for good cause or on some condition that is not wholly controlled by the promisor's will." 2 Corbin on Contracts § 6.14, at 313–14 & n.1 (rev. ed, 2003) (citing, inter alia, New England Oil Corp. v. Island Oil Mktg. Corp., 288 F. 961 (4th Cir. 1923) (seller of 2.7 million barrels of oil with option not to deliver if the wells produced less). Only an actual termination would affect Karns's duty under the contract. See U.C.C. § 2-106(3) ("'Termination' occurs when either party pursuant to a power created by agreement or law puts an end to the contract otherwise than for its breach. On 'termination' all obligations which are still executory on both sides are discharged . . . ."). Thus, regardless whether a termination option existed for Super Rite, absent the exercise of that option for cause, Karns still was obligated to meet certain purchase minimums and Super Rite still was obligated to allow Karns to keep the up-front payment if it did. In other words, "so long as [Karns] fulfilled the terms of the bargain, the money [was] its to keep." Indianapolis Power, 493 U.S. at 213.

The dissent conjectures that Karns might not continue to be viable. There is no suggestion in the facts that this is the case. To the contrary, Karns operated with the understanding that it would not be required to repay any of the funds. See App. at 135 (deposition of Scott Karns, CEO of Karns—that he "anticipate[d] that [he would] meet [his] purchase obligations" such that the "outstanding balance due SuperValu as a result of the [money transfer] in 1999" would "be zero."). In fact, Karns did not repay the funds with the exception of the fourth year (after Karns and SuperValu agreed to increase the minimum purchase amount in 2001 by $5 million); in 2003, Karns was required to pay a pro rata portion of $4,929.19. App. at 40–41. SuperValu treated this as a sales rebate that Karns failed to earn through its failure to meet the minimum purchase requirements that year. Id. at 40–41, 131–32. The Tax Court was dealing with a real life contract in a real life situation, and it decided accordingly.

For the reasons set forth above, we disagree with the

13

dissent as well as with the Ninth Circuit's decision in <u>Westpac</u>.[2]

## IV.

For the reasons set forth above, we will affirm the judgment of the Tax Court.[3]

**Karns Prime & Fancy Food, Ltd. v. Comm'r
No. 06-1031**

—

AMBRO, <u>Circuit Judge</u>, concurring.

I join Judge Sloviter's opinion in full. I write separately to supplement, from the accounting side, why I believe the result she reaches is correct and that of the Ninth Circuit (and by implication, that of our dissenting colleague) is unpersuasive.

[2] Karns also relies on the Tax Court's memorandum decision in <u>Erickson Post Acquisition, Inc. v. Comm'r</u>, 86 T.C.M. (CCH) 111 (2003). The Government has notified us that Tax Court memorandum decisions are not binding precedent in the Tax Court, and that it has announced its nonacquiescence in the Tax Court's decision in <u>Erickson Post</u>.

[3] The day before this opinion was due to be filed and after it had cleared the full court, we received a letter from counsel in this case for the Department of Justice's Tax Division advising that the Internal Revenue Service issued Revenue Procedure 2007-53, to be effective July 23, 2007, stating that the IRS will generally follow the Ninth Circuit's decision in <u>Westpac</u>. The letter states that "[t]he Department of Justice is presently considering whether to change its position in this case in light of this new Revenue Procedure." Inasmuch as we have not been notified of any change in position by a party before us, we proceed to file this opinion. Any relevant matter can be raised in a petition for panel rehearing, which will allow the DOJ and the IRS to confer further about what position the Government wishes to take with respect to that petition.

As a preliminary comment, this case is about timing. The value of money depends on when it is received. Both loans and advance payments confer an economic benefit on recipients because they allow the recipient "both immediate use of the money (with the chance to realize earnings thereon) *and* the opportunity to make a profit by providing goods or services at a cost lower than the amount of the payment." *Comm'r v. Indianapolis Power & Light Co.*, 493 U.S. 203, 207 (1990) (emphasis in original). Yet, under our laws the tax consequences for these two types of money transfers differ. Whereas loans are not taxable upon receipt, advance payments are. *Id.* at 208 n.3 (citations omitted); *Oak Indus., Inc. v. Comm'r*, 96 T.C. 559, 563–64 (1991).

## I.      Contrary Decisions in the Ninth Circuit

In *Westpac Pacific Food v. Comm'r*, the Ninth Circuit concluded that an up-front payment with a conditional *pro rata* repayment liability was a nontaxable loan. 451 F.3d 970, 975 (9th Cir. 2006).[4] It based its decision on assertions that (1) there was no absolute repayment obligation, *id.*, and (2) "[t]here was no accession to wealth when Westpac got the cash . . . ," *id.* at 977. The opinion for the majority here has dealt with the first part of this reasoning (as Karns, not Super Rite, controlled whether the

_____

[4] The Ninth Circuit reached an outcome similar to the one in *Westpac* in *Milenbach v. Comm'r*, 318 F.3d 924, 935–37 (9th Cir. 2003) (concluding that $6.7 million paid by the Los Angeles Memorial Coliseum Commission to the Los Angeles Raiders to develop the Coliseum was a loan rather than taxable income upon receipt even though the Raiders never built the Coliseum or repaid the money, because the contract specified a repayment obligation and did not contain a loan-forgiveness clause).

obligation to repay would occur); I address the second part.

For the *Westpac* Court, the case was very "simple," as told through the following hypothetical:

> Harry Homeowner goes to the furniture store, spots just the right dining room chairs for $500 each, and says "I'll take four, if you give me a discount." Negotiating a 25% discount, he pays only $1,500 for the chairs. He has not made $500, he has spent $1,500. Now suppose Harry Homeowner is short on cash, and negotiates a deal where the furniture store gives him a 20% discount as a cash advance instead of the 25% off. This means the store gives him $400 "cash back" today, and he pays $2,000 for the four chairs when they are delivered shortly after the first of the year. Harry cannot go home and say "I made $400 today" unless he plans to skip out on his obligation to pay for the four chairs. Even though he receives the

cash, he has not made money by buying the chairs. He has to sell the chairs for more than $1,600 if he wants to make money on them. The reason why the $400 "cash back" is not income is that, like a loan, the money is *encumbered with a repayment obligation to the furniture store and the "cash back" must be repaid if Harry does not perform his obligation*.

*Id.* at 971–72 (emphasis added). "This case is that simple," the Court reiterated, "except that it involves a little more math and a lot more money . . . ." Convinced that the agreement in that case was a nontaxable loan, the *Westpac* Court commented that "[i]t is hard to think of a way to make money by buying things." *Id.* at 971. Let's check that out.

## II.     The Ninth Circuit Tax Shelter, or How to Make Money By Buying Things

Consider a hypothetical involving Hal Homeowner, who would like to open a grocery distribution center out of his garage. Hal goes to the supermarket and, like Harry, is short on cash. Also consider what happens when Hal Homeowner files his taxes, which makes any simple hypothetical more complex. We will suppose that Hal makes a 100% profit on the value of each carton, meaning that for every $2,000 worth of food he buys he resells for

17

$4,000.  We will also assume a typical corporate tax rate of 34% (which the Government applied to Karns) applies here.

### Scenario 1

Hal Homeowner walks into a supermarket and eyes cartons of food for $400 each that would be ideal for his garage mini-mart.  The store owner sees what Hal Homeowner has in mind, and when it becomes clear that Hal has no money but a lot of potential, the owner puts this offer on the table: "I will give you 20% off now if you agree to buy five cartons ($2,000 worth of food) each year for the next six years."  Under this scheme, Hal pays each year just $1,600 for five cartons.  This is an example of a "volume supply discount" similar to the one that Harry Homeowner negotiated; Hal has gotten a 20%-off deal, except there is no cash advance involved here, which makes the tax calculation straightforward.  Each

18

year, Hal simply pays $1,600 for $2,000 worth of goods. He deducts that $1,600 in business expenses and reports $4,000 in resale to yield a taxable income of $2,400, which carries a tax liability of $816 per year.

### Scenario 2

Now suppose the store owner proposes this: "I will give you $400 now if you buy $2,000 worth of food each year for the next six years. This will get you started with your business, and you can just pay me back the $400 at the end of the year from your resale proceeds." Hal cannot go home and say "I made $400 today," because he has an unconditional obligation to repay the $400 loan at the end of the year. At the end of the first year, Hal duly pays back the loan, and on his tax forms he simply deducts $2,000 as business expenses from his total resale proceeds of $4,000 to yield a taxable income of $2,000,

which carries a tax liability of $680 each year.  This is $136 per year less than the tax liability in Scenario 1, which makes sense because Hal makes $400 less each year.

The reason that the $400 was not income is that it was subject to an unconditional repayment obligation, notwithstanding whether Hal performed on his contract by meeting minimum purchase requirements.  In other words, it was a *bona fide* loan.

### *Scenario 3*

Suppose the store owner proposes this: "I'll give you $400 now if you agree to buy five cartons ($2,000 worth of food) each year for the next six years.  If you can manage that, you don't have to worry about paying me back at the end of the year."  This seems like quite a deal to Hal, who readily agrees.  At the end of the first year, Hal deducts on his tax returns $1,600 in business expenses ($2,000 for the food minus $400 "cash back" off the full purchase price given in

exchange for the purchase commitment), and reports $4,000 in resale proceeds to yield a gross income of $2,400, which carries a tax liability of $816. This is the same as the tax liability in Scenario 1, for Hal has made the same amount. In subsequent years, Hal deducts $2,000 in business expenses and reports $4,000 in resale proceeds to yield a gross income of $2,000 each year, which carries an annual tax liability of $680.

When he first made the deal, Hal could go home and say, "I made $400 today," because he did not plan to skip out on his obligation to buy five cartons each year, was confident that he would resell the goods for profit, and thus had some assurance that he could keep his money and make back the rest from the proceeds of his resale. With this understanding, the $400 given to him at the outset was an advance payment that was taxable income when received.

So far, there is little cause for controversy over how Hal has done his taxes. He reported his profits as gross income in Scenario 1 (the volume supply discount without a cash advance); he repaid his loan and then reported his profits as gross income in Scenario 2 (the loan); and he reported his profits, along with the amount of cash he received up front, as gross income in Scenario 3 (the advance payment).

What happens if Hal wants to do his taxes a little differently in Scenario 3 in order to save some money?

### Scenario 4

> The facts are the same as Scenario 3, but Hal does his tax reporting differently. Instead of deducting $1,600 in the first year, Hal deducts $2,000 in business expenses and reports resale proceeds of $4,000 to yield a gross income of $2,000 in the first year, which carries a $680 tax liability. Hal plans on waiting until the end of his six-year term to pay tax on the $400 as "other income" (*i.e.*, "loan" forgiveness). He has realized a $136 tax savings (the difference between $816 due on $2,400 in Scenario 3 and $680 due on $2,000 in this scenario).

By deferring the taxes due on the $400, Hal is able to take advantage now of $2,400 (the up-front cash plus the $2,000 he makes in profits) without paying taxes on that full amount. Put differently, this means that he is able to take advantage of a $136 tax savings in the first year. If he pays taxes on the $400

22

as income in the year of receipt (as in Scenario 3), the present value of his tax liability over the course of the six-year deal is $3,368.35.[5]  But if Hal defers payment of taxes on the $400 until the end of Year 6 (as in Scenario 4), the present value of his tax liability will be only $3,331.87 over this same period.  The present value of his total tax savings is a difference of $36.48 ($3,368.35 in Scenario 3 minus $3,331.87 in Scenario 4), which is negligible when dealing in amounts so small.  But the amount grows when dealing in millions.

In Karns's case, the deferral of the tax payment resulted in a savings of about $500,000 by Year 6—the same amount that the Government argues is owed in back taxes.  This sort of difference demonstrates how advance payments confer an economic benefit.  As noted, they allow the recipient

---

[5] The present value of money (at some future time) is calculated by dividing the monetary amount (here: $816 in taxes on a $2,400 income) by the following: the product of the number of years (here: 1) and the discount rate (assumed: 7%) raised to the power of the number of years (here: 1).

Thus, the present value of an $816 tax liability for Year 1 at the end of the *first* year at a 7% rate is $762.62; the present values of a $680 tax liability for Years 2–6 are $593.94 at the end of the second year, $555.08 at the end of the third year, $518.77 at the end of the fourth year, $484.83 at the end of the fifth year, and $453.11 at the end of the sixth year.  Added together, this yields a sum of $3,368.35.

By contrast, the present value of an $816 tax liability for Year 1 at the end of the *sixth* year at a 7% rate is $543.74; the present values of a $680 tax liability for Years 1–5 are $635.51 at the end of the first year, plus—as before—$593.94 at the end of the second year, $555.08 at the end of the third year, $518.77 at the end of the fourth year, and $484.83 at the end of the fifth year.  Added together, this yields a sum of $3,331.87.

"immediate use of the money [or savings] . . . *and* the opportunity to make a profit by providing goods or services at a cost lower than the amount of the payment." *Indianapolis Power*, 493 U.S. at 208 (emphasis in original). For in Scenario 4 Hal's business expenses actually are only $1,600 ($2,000 minus the $400 advance), and by reporting his expenses as $2,000, he inflates his business deductions. He has gained immediate use of the up-front money and is able to profit by providing goods at a cost lower than the amount of the payment, resulting in a $136 tax savings in the first year. The arrangement in this case is similar. The lesson: when taxes on funds advanced in Year 1 are deferred and goods purchased in Year 1 are resold for profit, money indeed can be made by buying things.

## III.    Conclusion

At first blush, both tax payment schemes—pay now or pay later—may appear to be merely alternate ways of doing the math, because Hal Homeowner and Karns will eventually pay taxes on the up-front money. But we cannot view the "pay later" method as just another way of calculating taxes, because our laws require otherwise. First, Karns avails itself of an economic benefit through this method, which functions like a tax-deferral shelter that the Code has not authorized. Second, Karns's attempt to consider as a loan money that it will never have to repay contravenes the requirement that "an accrual-basis taxpayer [which Karns is] . . . [must] treat advance payments as income in the year of receipt." *Indianapolis Power*, 493 U.S. at 207 n.3 (citations omitted).

In sum, I am not persuaded by the analysis in

24

the Ninth Circuit.  It is the first and only Court of Appeals to conclude that trade discounts paid by the supplier to a taxpayer to offset the taxpayer's required minimum purchases are loans rather than advance payments.  Its conclusion contradicts our own emphasis (both before and after *Indianapolis Power*) that income may be considered to be a "loan" only when there is an unconditional repayment obligation. *See, e.g.*, *Geftman v. Comm'r*, 154 F.3d 61, 68 (3d Cir. 1998); *Diamond Bros. v. Comm'r*, 322 F.2d 725, 731 (3d Cir. 1963).

To reiterate, when understood this way, our case is about timing.  Funds received with no unconditional repayment obligation result in one set of profit margins and tax liabilities, and deferred tax payment on those same funds results in another set. For practical and policy reasons, our Tax Code and most decisions interpreting it require taxpayers to pay taxes for the year of receipt on funds advanced to them by suppliers when any purported repayment obligation is conditional on acts controlled by taxpayers—*i.e.*, when there is no unconditional repayment obligation.  Because there was no unconditional obligation to repay the money here, I believe that the $1.5 million received up front by Karns was an advance payment, taxable upon receipt. I therefore concur in affirming the Tax Court's assessment of taxes owed.

25

*Karns v. C.I.R.*

Dissent


BRODY, <u>District Judge</u>


Because the agreements between Super Rite and Karns provided no guarantee that Super Rite would allow Karns to keep the money it received as a loan from Super Rite, I respectfully dissent from the majority's conclusion that the loan was taxable income in the year it was received.


According to the majority, the agreement between retailer Karns and supplier Super Rite is functionally a single advance rebate formally divided into two parts:  a loan with a multi-year repayment period; and a multi-year Supply Agreement.  Super Rite would pay the advance rebate in the form of a loan, and would forgive the loan in annual installments as long as Karns annually bought the requisite amount of product under the Supply Agreement.  The majority concludes that the money was taxable when received because Karns was never obligated to repay the loan and always had control over whether it would keep the money.  That Karns might not be able to meet its obligations in the Supply Agreement is of no moment to the majority, which views Karns' ability to perform its contractual obligations as under Karns' "control" for tax law purposes.

As the majority recognizes, this decision holds that all advance trade rebates are taxable in the year received, in direct opposition to the Ninth Circuit's opinion in *Westpac Pacific Food v. C.I.R.*, 451 F.3d 970 (2006) (Kleinfeld, J.) I would not reach that broader question because the facts of *Westpac* are distinguishable: in this case, the transactions gave the taxpayer less control over the money than in the pure advance rebate in *Westpac*. In *Westpac*, the retailer was guaranteed to be able to keep the funds upon completion of its purchase obligations. But here, the loan provided no advance guarantee of forgiveness *even if* Karns made every effort to complete the purchases required by the Supply Agreement.[6]

It is true that Karns' annual loan payment would be forgiven as long as Karns was "in compliance" with the Supply Agreement for the year, and that the two transactions are linked. App. at 49 ("Promissory Note"). But Super Rite (in its role as supplier) had immense latitude to cancel the Supply Agreement. Under Section 5(vi) of the Supply Agreement, Super Rite could cancel the agreement

> Immediately upon the occurrence of a material adverse change in the condition (financial *or otherwise*), business *or prospects* of the Retailer *or any guarantor* of the Retailer's liabilities and obligations hereunder.

---

[6] I also disagree with the majority – *Westpac* was correctly decided. Advance rebates should be considered income only when they are actually earned through completed purchases.

27

App. at 52 (emphasis added).

This broad discretion to cancel the Supply Agreement for almost any kind of change in Karns or its guarantors' "condition" renders nigh illusory any control Karns might have had over the continued existence of the Supply Agreement.[7]  If Super Rite cancelled the Supply Agreement, Karns would be required to repay the loan.  Karns, then, had little meaningful control or "guarantee" that its loan would be forgiven at the time it received the loan.  Karns' actions (meeting the Supply Agreement's purchase amount requirements) would have *some* role in determining whether the loan would be forgiven.  But rather than being under Karns' exclusive control, forgiveness was ultimately subject to lender Super Rite's discretion over the Supply Agreement.  As such, it cannot be said that Karns had a "guarantee" that it would be able to keep the money.  *See Comm'r v. Indianapolis Power & Light Co.*, 4893 U.S. 203, 210 (1990) ("In determining whether [money is taxable income when received], the crucial point is . . . whether the taxpayer has some guarantee that he will be allowed to keep the money.")

The Supply Agreement also contained a

---

[7] This is not to say that the Supply Agreement is unenforceable as a matter of contract law – this is a federal law tax case, not a state law contract case.  The degree of control Karns had over the continued existence of the Supply Agreement is relevant here only to show that Karns had no meaningful "guarantee" that the Supply Agreement would continue.

liquidated damages clause:

> [T]he parties agree that upon Super Rite's cancellation of this agreement pursuant to Sections 2 or 5 of this Agreement, the Retailer will pay Super Rite as liquidated damages an amount equal to 1.0% of the product of (i) the Retailer's aggregate purchases from Super Rite during the preceding calendar year multiplied by (ii) the number of years remaining in the term of this Agreement.

App. at 53 (Section 7 of Supply Agreement). That a remedy for breach of the Supply Agreement is contained within the Supply Agreement itself belies the view that the loan and the Supply Agreement were one unitary advance rebate, with the loan simply functioning as a mechanism for quick collection of any unearned rebates. Instead, the loan was an independent transaction with all the characteristics of a bona fide loan.

The retail grocery business is a low-margin, cash-intensive endeavor. *See* Supermarket News 9, *Credit Crunch* (July 30, 2001), 2001 WLNR 9062811; National Governors Association Center for Best Practices, *Case Study: Pennsylvania's Fresh Food Financing Initiative* (noting that "[a]s communities become less dense, it is harder for

29

grocery stores to remain viable.").[8]  As such, access to credit is extremely important to retailers like Karns, and it makes sense that suppliers might step in to provide that credit.  That Super Rite served dual functions of supplier and creditor does not mean that in this case, the loan was not a loan.

---

[8] Available online at http://www.nga.org/Files/pdf/0510ACTIVELIVINGPA.PDF.